# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| MANDAN, HIDATSA, AND ARIKARA NATION,<br><br>*Plaintiff,*<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>*Defendant.* | Case No. 20-859 L<br><br>**COMPLAINT** |

## INTRODUCTION

1.   In this action the Plaintiff Mandan, Hidatsa, and Arikara Nation ("MHA Nation")[1] seeks compensation for the United States' breaches of its fiduciary duty to protect and preserve the MHA Nation's trust land—the minerals beneath the Missouri River within the Fort Berthold Reservation ("Reservation"). Specifically, the MHA Nation seeks redress for a recent M-Opinion by Department of Interior ("DOI") Solicitor Daniel Jorjani that purports to give away the MHA Nation's Missouri Riverbed rights, in contravention of binding DOI precedents dating back over 80 years, which recognize that the United States holds the Missouri Riverbed minerals within the Reservation in trust for the MHA Nation.[2] In addition, the MHA Nation seeks compensation for the

---

[1]   The MHA Nation consists of the Mandan, Hidatsa, and Arikara Tribes, which are sometimes referred to individually or, where appropriate, collectively as the "Tribes."

[2]   The MHA Nation will also file a complaint for declaratory and equitable relief in the federal district court seeking to set aside the Jorjani 2020 M-Opinion. This action is

monies that the United States has failed to collect on its behalf for the extraction of oil and gas from beneath the Missouri Riverbed.

2. The MHA Nation has long owned the bed of the Missouri River within the boundaries of the Reservation. The Reservation and the Missouri Riverbed within it are part of the MHA Nation's aboriginal territory. The Reservation was set aside for the MHA Nation before the State of North Dakota—within which the Reservation is located—was created and admitted to statehood.

3. Until May 26, 2020, it was the consistent position of the United States that the Missouri Riverbed minerals are part of the Reservation and are held in trust by the United States for the benefit of the MHA Nation and its members.

    a. In 1936, the DOI Solicitor issued an M-Opinion determining that an island formed from the bed of the Missouri River subsequent to North Dakota's statehood belonged to the MHA Nation, and not to North Dakota, because the Missouri Riverbed itself belonged to the MHA Nation prior to the admission of North Dakota to statehood.

    b. In 1979, the Interior Board of Land Appeals ("IBLA") issued a final adjudication holding that the Missouri Riverbed within the boundaries of the Reservation was a part of the Reservation prior to statehood and was not owned by the State of North Dakota. *Impel Energy Corp.*, 42 IBLA 105 (Aug. 16, 1979). The State of North Dakota, which had intervened in the

---

filed first to protect the MHA Nation's right to seek redress in this Court in light of 28 U.S.C. § 1500, *see United States v. Tohono O'odham Nation*, 563 U.S. 307 (2011).

        IBLA action, did not seek review of this final agency decision and it became binding on the parties to the appeal, and is also *res judicata*.

    c. In 1949, the United States took title to more than 150,000 acres encompassing the Missouri River within the Reservation that would be flooded by the construction of the Garrison Dam and the creation of Lake Sakakawea. *Impel Energy* held that Congress included the Missouri Riverbed and underlying minerals in the Takings Act, so that the minerals became federally owned after 1949. 42 IBLA at 110, 112-114. In 1984, Congress expressly restored all mineral interests in the taken area (with some exceptions not relevant here) to the MHA Nation, to be held in trust by the United States.

    d. In 2017, the DOI Solicitor issued another M-Opinion reaffirming the MHA Nation's beneficial ownership of the Missouri Riverbed within the boundaries of the Reservation.

4. Despite the DOI's longstanding and binding precedent, on May 26, 2020, the current DOI Solicitor issued opinion M-37056 (the "Jorjani 2020 M-Opinion"), which concluded that the State of North Dakota is the legal owner of submerged lands beneath the Missouri River where it flows through the Reservation. This unsupportable decision is a bald attempt to effectuate an unlawful transfer of the MHA Nation's valuable land to the State of North Dakota.

5. The State of North Dakota, despite the 1979 *Impel Energy* decision, has continued to assert ownership of the Missouri Riverbed within the boundaries of the

Reservation and has leased mineral rights thereunder to private parties. The United States has failed to halt these unlawful leases and has failed to collect, for the benefit of the MHA Nation, the revenues generated by these leases.

6. The Jorjani 2020 M-Opinion is a betrayal and an utter abdication of the United States' fiduciary obligations to the MHA Nation. It is also a breach of treaty, agreements, and statute, and an unconstitutional taking.

7. The MHA Nation seeks just compensation and damages from the United States for the losses caused by the United States' breaches of trust, treaty, and law.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this action under 28 U.S.C. § 1505 (the Indian Tucker Act) because this action involves claims against the United States for money damages brought by an Indian tribe arising under the Constitution, laws, treaties, regulations, or Executive Orders of the United States, as set forth herein. Venue in this Court is also proper under the Indian Tucker Act.

## PARTIES

9. Plaintiff, the MHA Nation, is a federally-recognized Indian tribe located in the Fort Berthold Indian Reservation in central North Dakota. Composed of the Mandan, Hidatsa, and Arikara Tribes, the MHA Nation is also known as The Three Affiliated Tribes of the Fort Berthold Reservation.

10. Defendant United States of America holds land and mineral rights in trust for the MHA Nation.

11. The United States has waived its immunity to suit for damages in this Court pursuant to the Indian Tucker Act.

## FACTUAL ALLEGATIONS

### I. THE MHA NATION OWNS THE MISSOURI RIVERBED MINERALS WITHIN THE RESERVATION.

*A.     The development of the boundaries of the Fort Berthold Reservation.*

12. The United States has continuously recognized the MHA Nation's use and occupation of the Missouri River and the surrounding area since before the first treaties were made with the MHA Nation in 1825.

13. Following hostilities in 1823 known as the Arikara War, the United States sent General Henry Atkinson and Indian Agent Benjamin O'Fallon to make peace with the Tribes. In the summer of 1825, the treaty delegation travelled up the Missouri River and met with all three Tribes at their respective villages on the river. The United States executed and ratified treaties with the Tribes to establish "a firm and lasting peace" and promote "friendly intercourse" between the Tribes and the United States. Among other terms, the United States acknowledged the Tribes' "country" and agreed to receive the Tribes "into their friendship, and under their protection[.]" The 1825 treaties also addressed bilateral trade and promised indemnification for property taken from the Tribes. Treaty with the Arikara, 7 Stat. 259; Treaty with the Mandan, 7 Stat. 264; Treaty with the Hidatsa, 7 Stat. 261.

14. The 1851 Treaty of Fort Laramie was the United States' attempt to make peace and divide the territory south and west of the Missouri River among a number of tribes, including the MHA Nation. Article 5 of the treaty recognized the vast territory

used and occupied by the MHA Nation south and west of the Missouri River, but also acknowledged that the MHA Nation did not "hereby abandon or prejudice any rights or claims they may have to other lands." Treaty of Fort Laramie with Sioux, Etc., Sept. 17, 1851, 11 Stat. 749.

15. On April 12, 1870, President Grant signed an Executive Order that limited the boundaries of the MHA Nation's territory, becoming known as the Fort Berthold Reservation. Exec. Order (Apr. 12, 1870) (1870 Executive Order). The boundaries of this Reservation encompassed approximately 7.8 million acres of land. The Tribes consulted about and consented to the 1870 Executive Order. The Reservation boundaries were described as beginning and ending at a point on the Missouri River and expressly included the outer bank of the Missouri River:

> <u>From a point on the Missouri River</u> 4 miles below the Indian Village (Berthold), in a northeast direction 3 miles (so as to include the wood and grazing around the village); from this point a line running so as to strike the Missouri River at the junction of the Little Knife River with it; <u>thence along the left bank of the Missouri River</u> to the mouth of the Yellowstone River, along the south bank of the Yellowstone River to the Powder River, up the Powder River to where the Little Powder River unites with it; thence <u>in a direct line across to the starting point</u> 4 miles below Berthold. (Emphasis added.)

Use of the term "left bank" meant the north and east sides of the Missouri River, thereby necessarily including the width of the River within the Reservation boundaries.

16. A decade later, and without any tribal consultation or consent, President Hayes signed an 1880 Executive Order removing a large tract of land in the south and west portion, and adding some land north and east, of the 1870 Fort Berthold Reservation. Exec. Order (July 13, 1880) (1880 Executive Order).

6

17. Both the 1870 Executive Order and the 1880 Executive Order expressly included the Missouri River within the Reservation's boundaries, describing the boundaries by reference to the Missouri River's outer banks.

18. Congress has recognized that the 1870 and 1880 Executive Orders set aside the Reservation for the MHA Nation.

19. In 1886, the United States negotiated another agreement with the Tribes. By this 1886 Agreement, the Tribes ceded additional lands back to the United States. Congress ratified this Agreement in 1891. Act of Mar. 3, 1891, ch. 543, § 23, 26 Stat. 989, 1032 (1891). This 1886 Agreement set the boundaries for the Reservation that, for the most part, constitute the Reservation today.

20. The State of North Dakota constitutionally disclaimed all right and title to "Indian lands" upon its admission to the Union in 1889. N.D. Const., art. XVI, § 203 (1889).

  B.  *The United States acquires Reservation land for the Garrison Dam Project and subsequently restores the subsurface mineral rights to the MHA Nation.*

21. In 1944, Congress authorized construction of the Garrison Dam as part of a federal plan to develop a series of dams along the Missouri River. In order to construct the dam, in 1949 the United States took more than 150,000 acres of land in the Reservation that would be flooded by the creation of Lake Sakakawea.

22. Pursuant to the 1949 Takings Act, Congress vested title to the "Taking Area" solely in the United States. Pub. L. No. 81-437, ch. 790, 63 Stat. 1026 (1949). The MHA Nation lost all of its most fertile agricultural bottom land and was deprived of the

subsurface minerals within the Taking Area. Over 90% of the MHA Nation's population was forcibly relocated from their traditional homes along the river bottom to the uplands on the Reservation.

23. In the early 1970s the Reservation was found to overlay one of the largest oil fields in the United States, with an estimated 250 billion barrels of oil reservoir-wide and hundreds of millions of barrels of oil, millions of cubic feet of gas, and tons of coal beneath the Reservation itself.

24. In 1984, Congress explicitly restored the mineral interests in the taken area to trust status for the benefit and use of the MHA Nation in the Fort Berthold Reservation Mineral Restoration Act. Pub. L. No. 98-602, tit. 2, 98 Stat. 3149, 3152 (1984) (the "Restoration Act").

## II. THE DOI IS BOUND BY PRIOR DECISIONS THAT THE MISSOURI RIVERBED IS PART OF THE RESERVATION AND IS NOT OWNED BY THE STATE OF NORTH DAKOTA.

25. In 1936, DOI Solicitor Nathan Margold issued an M-Opinion determining that the Missouri riverbed, and an island formed from the riverbed subsequent to North Dakota's statehood, belonged to the MHA Nation and not to North Dakota. He opined that the Riverbed was part of the Reservation prior to the admission of North Dakota to statehood and so islands subsequently formed from the Riverbed were part of the Reservation. The Margold M-Opinion was approved by the Office of the Secretary of the DOI.

26. In 1978, the DOI's Bureau of Land Management ("BLM") rejected Impel Energy Corporation's application for fifteen federal oil and gas leases covering the

Missouri Riverbed lands within the Reservation. The BLM took the position that the Riverbed passed to North Dakota at statehood and was no longer held in trust for the MHA Nation.

27. Impel Energy appealed that decision to the IBLA. On appeal, Impel Energy argued that the riverbed lands were "federally owned, because title to the lands was held by the United States in trust for the Indians of the Fort Berthold reservation from 1851 until title was transferred to the United States in 1949 to permit construction of the Garrison Dam and Reservoir." *Impel Energy Corp.*, 42 IBLA 105, 110 (Aug. 16, 1979). The State of North Dakota intervened in that appeal and advocated that the Riverbed belonged to it.

28. The IBLA agreed with Impel Energy, ruling that "the language of the Treaty of Fort Laramie and the Executive Order of April 12, 1870, when considered with the case law and the various utterances made contemporaneously with the treaty, discloses an intention to include the lands underlying the Missouri River, insofar as it runs through the Fort Berthold reservation, among the lands of the reservation itself. The import of this finding is that title to the lands which Impel seeks to lease for oil and gas has never passed to the State of North Dakota." 42 IBLA at 114.

29. The IBLA decision is a final agency action and is binding on the DOI. 43 C.F.R. § 4.403.

30. The State of North Dakota did not seek judicial review of the IBLA's *Impel* decision. Accordingly, the *Impel* decision is *res judicata* and is also binding on the DOI and the State of North Dakota.

31. The BLM subsequently issued the oil and gas leases at issue in *Impel*. The leases were initially held as Federal leases, administered by the BLM, until the 1984 Restoration Act restored mineral interests within the Reservation in trust for the MHA Nation, at which point BLM transferred the leases to the Bureau of Indian Affairs ("BIA").

32. Following the Restoration Act, the BIA assigned mineral tribal tract numbers, commonly known as MT tracts (denoting "mineral tribal"), and recorded the island (at issue in the 1936 M-Opinion) in trust for the benefit of the MHA Nation in the DOI's Office of Land Titles and records. The BIA failed, however, to assign mineral tract numbers or record trust title to the rest of the riverbed minerals.

### III. THE UNITED STATES FAILS TO PROTECT THE MHA NATION'S TRUST RESOURCES.

33. Despite the IBLA's controlling 1979 decision in the *Impel Energy* case, the BIA allowed oil and gas operators to drill horizontally into and extract oil and gas from the Missouri riverbed within the Reservation without authorization required by federal law. The DOI failed to collect the revenue produced from riverbed oil and gas extraction. Revenue from oil and gas extracted from the riverbed exceeds $200,000,000 that belongs to the MHA Nation.

34. On August 2, 2011, the MHA Nation's then-Chairman Hall sent a letter to the DOI's Assistant Secretary – Indian Affairs requesting that the BIA "complete any actions necessary to implement the Department of Interior decisions that the bed of the Missouri River is owned by the United States in trust for the MHA Nation." Further, the

letter noted that the BIA had begun correcting title documents but that title work was not completed. Chairman Hall's letter warned that "[t]he currently incomplete title documents and maps are causing confusion regarding ownership, delaying oil and gas development and the payment of royalties."

35. The MHA Nation followed Chairman Hall's letter with another letter, this one dated September 26, 2011, to Carla Clark, Deputy Realty Officer for the BIA. This letter also requested that BIA complete its work on the title documents showing that the United States held the bed and banks of the Missouri River within the Reservation in trust for the MHA Nation.

36. On September 12, 2012, Chairman Hall addressed the Commission on Indian Trust Administration and Reform. The Chairman noted that the United States had failed to implement the 1936 M-Opinion and the 1979 IBLA decision and stated "[i]n order to fulfill its trust responsibility, it is incumbent upon the BIA to implement the Solicitor's opinion and accomplish the ministerial act of recording the MHA Nation's trust title in the Office of Land Titles and Records."

37. The MHA Nation continued to request that the DOI record its title in the riverbed minerals on numerous occasions after September 12, 2012. The MHA Nation could not develop its riverbed minerals without the assigned mineral tract numbers.

38. The United States failed to timely take custody of, maintain, and record the MHA Nation's trust title.

39. In 2017, DOI Solicitor Hilary Tompkins issued another M-Opinion, which reaffirmed the 1936 M-Opinion and concluded that the mineral interests underlying the

11

original bed of the Missouri River within the Reservation are held in trust for the benefit of the MHA Nation.

40. As Solicitor Tompkins explained, if the 1949 Takings Act is construed to include the Missouri Riverbed as part of the Taking Area, then Congress restored it to the MHA Nation in the 1984 Restoration Act. If the 1949 Takings Act is construed to exclude the Missouri Riverbed from the Taking Area, then the MHA Nation has always owned it.

## IV. THE JORJANI M-OPINION PURPORTS TO UNLAWFULLY OVERTURN THE IBLA ADJUDICATION AND REPUDIATES THE UNITED STATES' FIDUCIARY DUTIES TO THE MHA NATION.

41. In August of 2017, the State of North Dakota urged the DOI to revisit its decisions that the minerals under the Missouri River are held in trust for the MHA Nation. North Dakota elected and appointed officials and/or staff expressed a desire for the State to "re-engage" with BIA on North Dakota's efforts to take the MHA Nation's valuable mineral interests, and explicitly asked: "Could the current solicitor suspend the [2017 Tompkins M-Opinion]?" This request was forwarded through political channels to Daniel H. Jorjani, then-Principal Deputy Solicitor for DOI, who promised to look into the issue.

42. On June 8, 2018, Mr. Jorjani suspended Solicitor Tompkins' 2017 M-Opinion insofar as it addresses "ownership of minerals located beneath the original bed of the Missouri River," claiming that "the underling historical record should be reviewed and perhaps expanded upon by a professional historian."

43. On May 26, 2020, Mr. Jorjani issued M-37056, which concluded that the State of North Dakota is the legal owner of submerged lands beneath the Missouri River where it flows through the Reservation. This opinion purported to overturn previous Departmental decisions related to this issue and to supersede "guidance" provided in Solicitor's Opinion in 1936, and by the IBLA in its 1979 *Impel Energy* decision. The Jorjani 2020 M-Opinion concluded by advising the BIA and BLM "to take any actions deemed necessary to comply with this opinion, to include the withdrawing of any existing oil and gas permits for extraction in submerged lands beneath the Missouri River."

44. In withdrawing the 2017 M-Opinion and subsequently issuing the Jorjani 2020 M-Opinion, the DOI acted at the behest of the State of North Dakota. These actions were in direct conflict with the interests of the MHA Nation and the United States' obligations as trustee. In so doing, the United States considered conflicting state interests over its trust responsibility to protect the MHA Nation's property.

## V.  THE UNITED STATES HAS BREACHED ITS OBLIGATIONS TO THE MHA NATION.

45. The United States holds the MHA Nation's land and natural resources within the Reservation in trust as a fiduciary for the MHA Nation.

46. The United States has a fiduciary obligation to protect and preserve the MHA Nation's land and natural resources, including the Missouri Riverbed minerals.

47. The United States' fiduciary duty to protect and preserve the MHA Nation's land and natural resources includes the obligation to protect them from claims by others.

48. Land held in trust by the United States for the benefit of an Indian tribe is inalienable except as authorized by Congress. 25 U.S.C. § 177. Congress alienated the MHA Nation's minerals in the 1949 Taking Act, and then restored them in trust for the MHA Nation in the 1984 Restoration Act. Alternatively, if Congress did not take the Missouri Riverbed and underlying minerals in the 1949 Taking Act, then the Missouri Riverbed and underlying minerals have never been alienated by Congress, remain a part of the MHA Nation's aboriginal territory, and are held in trust by the United States for the MHA Nation.

49. Pursuant to applicable laws and regulations, the Secretary has exercised comprehensive control and supervision over the Reservation and its natural resources.

50. Various statutes and regulations, including 25 U.S.C. § 177, 25 U.S.C. §§ 396a–396g, 25 U.S.C. § 464, 25 U.S.C. §§ 2101-2108, 25 U.S.C. § 4043, 30 U.S.C. §§ 1701–1757, 25 C.F.R. Parts 211 and 225, and 30 C.F.R. Parts 202 and 206, impose fiduciary obligations on the United States to administer, manage, and account for the MHA Nation's trust property and oil and gas resources, and to do so in such a manner as to ensure that the MHA Nation obtains full and fair value for the lease or use of its property and resources. This includes an obligation to ensure the prompt and proper collection and disbursement of royalties or other revenue derived from trust property.

51. Various statutes and regulations, including 25 U.S.C. §§ 2, 5-6, 9, and 25 C.F.R. Part 150, impose fiduciary obligations on the United States to record, provide custody, and maintain records that affect titles to Indian land.

52. Various statutes and regulations, including 25 U.S.C. §§ 155, 161a, 162a, and 4043, and 25 C.F.R. Part 115, impose fiduciary obligations on the United States to collect funds owing to the MHA Nation from the lease or use of Tribal land, resources or assets, to deposit those funds in interest bearing accounts for the MHA Nation, to invest such funds and the interest on such funds in a prudent manner and/or to pay those funds over to the MHA Nation.

## CAUSES OF ACTION

### COUNT I: BREACH OF TRUST (TAKING)

53. Plaintiff re-alleges and incorporates by reference all the allegations set forth in this Complaint.

54. The United States has breached its fiduciary and legal duties to the MHA Nation by disclaiming title to the Missouri Riverbed minerals within the boundaries of the Reservation, which it holds in trust for the MHA Nation.

55. The Jorjani 2020 M-Opinion constitutes a breach and a repudiation of the United States' fiduciary duties to the MHA Nation.

56. The MHA Nation is entitled to recover monetary damages in an amount to be determined for the United States' breach of trust.

**COUNT II: BREACH OF TRUST (NATURAL RESOURCE PROTECTION)**

57. Plaintiff re-alleges and incorporates by reference all the allegations set forth in this Complaint.

58. The United States has breached its fiduciary and legal duties to the MHA Nation to protect, preserve, and/or manage the MHA Nation's land and resources by, without limitation:

   a. Allowing the State of North Dakota to issue leases for the mineral estate beneath the Missouri Riverbed within the Reservation;

   b. Allowing third parties to drill for oil and gas beneath the Missouri Riverbed within the Reservation without having a lease or agreement with the MHA Nation that is approved by the DOI;

   c. Failing to properly take custody of, record, and maintain the MHA Nation's title as required by federal statutes and regulations;

   d. Failing to defend the MHA Nation's interests against claims by others;

   e. Depriving the MHA Nation of protections given to Indian lands by federal law;

   f. Failing to collect, or to promptly collect, revenue owed to the MHA Nation for oil and gas extracted from beneath the Missouri Riverbed within the Reservation, and failing to properly remit, deposit, or invest such funds;

    g. Damaging the MHA Nation's ability to lease and develop the mineral resources beneath the Missouri Riverbed within the Fort Berthold Reservation; and

    h. Failing to properly protect, administer, and manage the MHA Nation's resources and act in the MHA Nation's best interest.

59. The MHA Nation is entitled to recover monetary damages in an amount to be determined for the United States' breaches of trust.

**COUNT III: BREACH OF TREATIES, AGREEMENTS AND STATUTES**

60. Plaintiff re-alleges and incorporates by reference all the allegations set forth in this Complaint.

61. The various treaties and agreements between the United States and the MHA Nation constitute valid, enforceable, bargained-for rights and obligations.

62. Under these treaties and agreements, the United States promised, among other things, to protect and defend the MHA Nation's property, and to indemnify the MHA Nation for its loss unless the property could be recovered, which includes its mineral rights under the Missouri Riverbed.

63. Under these treaties and agreements, and/or the Restoration Act, the United States owns the Missouri Riverbed minerals within the Reservation in trust for the MHA Nation.

64. Under federal law and statutes, including 25 U.S.C. §§ 177 and 464, the United States and its agents are prohibited from conveying title to the MHA Nation's land without the consent of Congress.

65. The United States has breached its obligations to the MHA Nation under these treaties, agreements, and statutes.

66. The MHA Nation is entitled to compensatory damages for the United States' breaches of its contractual or statutory obligations.

### COUNT IV: UNCONSTITUTIONAL TAKING WITHOUT COMPENSATION

67. Plaintiff re-alleges and incorporates by reference all the allegations set forth in this Complaint.

68. The Missouri Riverbed and underlying minerals within the Reservation belong to the MHA Nation and are held in trust for the MHA Nation by the United States.

69. The United States cannot give tribal property to others without rendering, or assuming an obligation to render, just compensation for those taken lands.

70. The Jorjani 2020 M-Opinion purports to cede or transfer to the State of North Dakota ownership of the Missouri Riverbed within the Reservation.

71. Unless it is reversed, the Jorjani 2020 M-Opinion constitutes a compensable taking of the MHA Nation's property.

72. The United States has not paid the MHA Nation any compensation for this taking as required by the Fifth Amendment to the United States Constitution.

73. The MHA Nation is entitled to just compensation for its taken property interests, in an amount to be determined.

### PRAYER FOR RELIEF

Therefore, Plaintiff respectfully requests that the Court grant the following relief:

A. An award of compensatory monetary damages and just compensation in an amount to be determined at trial, plus allowable interest.

B. Plaintiffs' costs and attorney's fees incurred in the prosecution of this action; and

C. Any further relief as the Court may deem just and equitable.

Dated: July 15, 2020

**ROBINS KAPLAN LLP**

By: s/*Timothy Q. Purdon*
    Timothy Q. Purdon
    1207 West Divide Avenue, Suite 200
    Bismarck, ND 58501
    701-255-3000
    TPurdon@RobinsKaplan.com

    Timothy W. Billion
    140 North Phillips Avenue, Suite 307
    Sioux Falls, SD 57104
    605-335-1300
    TBillion@RobinsKaplan.com

    *and*

**HOLLAND & KNIGHT LLP**

    Steven D. Gordon
    Philip Baker-Shenk
    800 17th Street, N.W., Suite 1100
    Washington, D.C.  20006
    steven.gordon@hklaw.com
    philip.baker-shenk@hklaw.com
    Tel: (202) 955-3000
    Fax: (202) 955-5564

    *Attorneys for Plaintiff Mandan, Hidatsa, and Arikara Nation*